# The United States Court of Federal Claims

No. 11-904C
(Filed: December 21, 2012)

```
* * * * * * * * * * * * * * * * * * * *
                               *
JON T. HOFFMAN,                *
                               *
                               *    Military pay; Disability Determination;
             Plaintiff,        *    Military Correction Board.
                               *
v.                             *
                               *
THE UNITED STATES,             *
                               *
             Defendant.        *
                               *
* * * * * * * * * * * * * * * * * * * *
```

*Raymond Jewell Toney,* Woodland, CA, for plaintiff.

*Michelle Milberg*, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, for defendant.  *LT. Chris Jeter*, Office of the Judge Advocate General, General Litigation Division, of counsel.

**O P I N I O N**

**FIRESTONE**, *Judge*.

    In this military pay case, Colonel Jon T. Hoffman ("the plaintiff" or "Colonel

Hoffman"),[1] a now retired member of the Marine reserves, claims that he is entitled to a

disability retirement under 10 U.S.C. § 1201 (2006 & Supp. II 2008) for a disease that he

---

[1] As discussed infra, Colonel Hoffman is a retired reserve officer.  He joined the United States Marine Corps ("Marines") in 1976 and served on continuous active duty until 1992.  He was placed on the retired reserve list (awaiting pay at age 60) on September 30, 2008.

alleges was incurred while serving on active duty.  Colonel Hoffman was denied a disability retirement by a Formal Physical Evaluation Board ("PEB") on April 8, 2008, which determined that although Colonel Hoffman suffers from a serious illness, amyloidosis,[2] his illness was in remission and he was "Fit" for service and therefore he was not entitled to disability benefits.[3]  The plaintiff appealed the PEB ruling to the Board of Corrections for Naval Records ("BCNR"), which affirmed the PEB's "Fit" determination.  In his pending motion for judgment on the administrative record, Colonel Hoffman asks that the court reverse the PEB's and BCNR's "Fit" determinations and change his status from "Retired Reserve Awaiting Pay at Age 60" to Permanent Disability Retired List ("PDRL"), with a rating of 100 percent disabled effective January 3, 2006.  He further seeks retroactive disability retirement pay from January 3, 2006 to the date of the court's order, as well as from the court's order forward.

The defendant, the United States ("the defendant" or "the government"), has cross-moved for judgment upon the administrative record arguing that the BCNR's decision affirming the Formal PEB's finding of "Fit" and resulting denial of disability

---

[2] Amyloidosis is a systemic disease that progressively deposits harmful proteins into the body's internal organs, potentially leading to organ failure and premature death.  Administrative Record ("AR") 147.

[3] "Fit" and "Unfit" are terms of art within the Department of Defense ("DoD") Disability Evaluation System.  "A [s]ervice member shall be considered ["Unfit"] when the evidence establishes that the member, due to physical disability, is unable to reasonably perform the duties of his or her office, grade, rank, or rating . . . to include duties during a remaining period of [r]eserve obligation."  Department of Defense Instruction ("DoDI") 1332.38 ¶ E3.P3.2.1 (November 1996).

benefits must be upheld on the grounds that it was not arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

For the reasons discussed below, the government's motion for judgment on the administrative record is **GRANTED** and the plaintiff's motion for judgment on the administrative record is **DENIED**.

## I.   BACKGROUND

### A.  The Relevant Statutory and Regulatory Provisions

In considering a claim for a military disability retirement both the statutes and regulations governing retirement or separation benefits due to physical disability must be considered together with the regulations governing "incapacitation" benefits for conditions determined to have been incurred or aggravated while the service member was 'in the line of duty.'[4]   Under 10 U.S.C. Chapter 61, the DoD regulations implementing that statute, and the Navy's and Marine Corps' tailoring of those regulations,[5] a Marine reservist, like Colonel Hoffman, may be placed on "disability retired" status if the service member is determined to be "Unfit" by reason of a physical disability and is otherwise eligible.  See DoDI 1332.38 ¶ E2.1.7 ("Compensable Disability").  In addition, Marine reservists may also be eligible for incapacitation benefits for injuries, illnesses, or

---

[4] As noted infra, (footnote 29) Colonel Hoffman did not seek or receive "incapacitation" pay when he first sought disability benefits and never made a formal claim for such benefits before the BCNR.  Incapacitation benefits available to eligible members may include dental and medical treatment, hospitalization, incapacitation pay, Federal civil service employment benefits and disability retirement or separation pay.  SECNAVINST 1770.3C ¶ 3.

[5] The DoD has issued regulations governing disability determinations for both active duty and reserve service members.  DoDI 1332.38 ¶ 4.2 (November 1996).  DoDI 1332.38 was tailored to the Navy by Secretary of the Navy Instruction ("SECNAVINST") 1850.4E (April 2002).

diseases incurred (or aggravated) during periods of inactive duty training or during periods of active duty.  See 37 U.S.C. § 204 (2006).[6]  Specifically, reservists found eligible for incapacitation pay are given line of duty determinations ("LODD"), formerly referred to as Notices of Eligibility ("NOE") for disability benefits, which give reservists additional rights in connection with a claim for disability benefits.  See SECNAVINST 1770.3D ¶ 6(k) (March 2006).  A positive LODD or NOE  is made if the military determines that the injury or disease was incurred or aggravated in the line of duty. SECNAVINST 1770.3C ¶ 7(a)(1); SECNAVINST 1770.3D ¶ 6(k).  A reservist who has received a LODD/NOE also will be processed into the military's Disability Evaluation System ("DES") differently from one who does not have an NOE.  See Laningham v. United States, 2 Cl. Ct. 535, 547 (1983).

In general, the DES process includes evaluation(s) by a Medical Evaluation Board ("MEB")[7] or in some cases by the Chief, Bureau of Medicine and Surgery ("CHBUMED"); physical disability evaluation(s) by Informal and/or Formal PEBs;[8]

---

[6] The DoD has issued regulations governing incapacitation benefits.  DoDI 1241.1 (February 2004), DoDI 1241.2 (May 2001).  DoDI 1241.1 was tailored to the Navy by SECNAVINST 1770.3C (April 2002) (superseded by SECNAVINST 1770.3D (March 2006)) and further tailored to the Marines by Marine Corps Order ("MCO") 1770.2A (October 1991).

[7] A medical evaluation by a MEB is required for a service member with an NOE or when, among other things, the member is on active duty for a period of more than 30 days or the reservist is referred to the DES for a duty-related impairment.  DoDI 1332.38 ¶ E3.P1.2.2.  By contrast, "either a physical examination or a MEB is sufficient when a reserve component member is referred for a condition unrelated to the member's military status and performance of duty."  Id.

[8] "Once a [Formal PEB] hearing has convened, any preliminary findings of the Informal PEB are null and void and are of no precedential value to the Formal PEB or the member." SECNAVINST 1850.4E ¶ 4301(c).

service member counseling; and a final disposition regarding continued service.  DoDI
1332.38 ¶ E3.P1 et seq.  Ultimately, the PEB has the responsibility for determining
whether the member is "Fit" or "Unfit" for continued service.  When the PEB finds that a
member is "Unfit," the member may be eligible to receive disability retirement benefits.
SECNAVINST 1850.4E ¶ 3405(b).  If the service member is found "Unfit" and is also
eligible for benefits, the member will then be given a disability "rating."[9]  The standard
for determining if a member is "Unfit" under DoDI 1332.38 is whether the member, due
to physical disability, is unable to reasonably perform the duties of his or her office,
grade, rank, or rating, including during a remaining period of reserve obligation.  DoDI
1332.38 ¶ E3.P3.2.1.  In instances when doubt concerning fitness cannot be resolved,
SECNAVINST 1850 ¶ 3306(a) states that the PEB should find, "in favor of the fitness of
the service member under the rebuttable presumption that the member desires to be found
'Fit']."

Eligibility for disability benefits in all cases turns on whether the reservist is
"Unfit" because of a physical condition incurred (or aggravated) in the line of duty or
while the service member was entitled to receive basic pay.  SECNAVINST 1850.4E ¶
3406.  In cases where a service member is found "Unfit" but is found to have an unstable
or potentially nonpermanent disability, the service member is placed on the Temporary

---

[9] The disability rating is a percentage that represents, "as far as can practically be determined,
the average impairment in civilian occupational earning capacity resulting from certain diseases
and injuries, and their residual conditions."  DoDI 1332.39 (November 1996); DoDI 1332.38 ¶
E3.P4.6 (compensable disabilities rated according to the Veterans Administration Schedule for
Rating Disabilities ("VASRD")).

Disability Retirement List ("TDRL").  10 U.S.C. § 1202.[10]  Service members on the

TDRL are periodically reevaluated until a final disability determination can be made after

the condition stabilizes, or five years.  See DoDI 1332.38 ¶ E3.P.6.[11]

Under Navy regulations, reservists who receive a positive NOE [12] are entered into

the DES under SECNAVINST 1850.4E ¶ 3201(b)(1).  Reservists who have not obtained

a NOE are processed under SECNAVINST 1850.4E ¶¶ 3201(b)(2).  Reservists processed

under SECNAVINST 1850.4E ¶ 3201(b)(1) will be examined by a MEB and will then be

evaluated by the PEB.  Reservists processed without a NOE may instead be evaluated

under SECNAVINST 1850.4E ¶¶ 3201(b)(2) by the CHBUMED to determine whether

the reservist is Not Physically Qualified ("NPQ") for continued naval service.  A reservist

found NPQ can appeal that determination to the PEB, otherwise he or she will be

honorably discharged, retired if eligible, or offered non-regular retirement.  See id. ¶¶

1003(d), 3703.

---

[10] A pre-requisite to placement on the TDRL is a finding by a competent board that the service member is "Unfit" for duty.  See 10 U.S.C. §§ 1201, 1202.

[11] "Members with unstable conditions rated at a minimum of 80 percent and which are not expected to improve to less than an 80% rating, shall be permanently retired."  DoDI 1332.38 ¶ E3.P6.1.2.

[12] To qualify for a NOE, Marine reservists are required to promptly report the incurrence or aggravation of a condition to their command, and failure to do so can result in the denial of benefits.  MCO 1770.2A ¶ 6.  The reservist's commanding officer is then required to forward a NOE request for benefits to the Assistant Deputy Commandant, Manpower and Reserve Affairs. See id. ¶ 8; SECNAVINST 1770.3C ¶ 7(c).  Reservists who receive a negative NOE/LODD determination may appeal to the Office of the Judge Advocate General within 60 days of suspension or termination of benefits.  SECNAVINST 1770.3C ¶ 12; SECNAVINST 1770.3D ¶ 12.

A reservist without a NOE is not ordinarily eligible to receive a disability

retirement, see id. ¶ 3408, whereas a reservist with a NOE and found to be "Unfit" will be

eligible for disability benefits.   Nonetheless, a reservist without a NOE may still obtain

disability benefits, if on appeal to the PEB the PEB finds that the reservist is "Unfit"  and

further finds that the disabling condition was incurred "[w]hile . . . the member was

ordered to active duty and serve[d] a period of active duty greater than 30 days; and . . .

his/her medical records contain documentation as to the nature of the member's

conditions and the approximate date of its incurrence [or] aggravation. . . ."

SECNAVINST 1850.4E ¶ 3201(b)(3).  In this connection, the PEB is only permitted to

make a "Fit" or "Unfit" determination if the PEB determines that the condition was

incurred or aggravated during a period of active duty.  Id.[13]  If the PEB fails to make the

findings outlined in Paragraph 3201(b)(3), the PEB will make "a Physically

Qualified/Not Physically Qualified determination," id., and disability benefits will not be

awarded.

### B.  Colonel Hoffman's Service History

Colonel Hoffman began his career in the Marines in 1976.  Although his original

Military Occupational Specialty ("MOS") was that of an infantry officer, he has served as

---

[13] SECNAVINST 1850.4E ¶ 1003(e) similarly provides, "[a] reservist on extended active duty for more than 30 days . . . who has been released from active duty and is now in an inactive duty status and requests referral to the PEB for a condition which the member alleges was incurred or aggravated while on active duty shall be processed into the DES and the PEB shall determine and record whether the member is ["Fit" or "Unfit."]  In this instance, the reservists comes under the provisions of 10 U.S.C. [§§] 1201-1203 and not 10 U.S.C. [§§]1204-1206 . . . .  In such a situation, 'in line of duty while entitled to basic pay' rather than 'proximate result' is the applicable [statutory] requirement for entitlement to disability compensation."

a Field Historian within the Marine Corps History Division since 1986.  AR 112.  The

Field History Branch, to which the plaintiff was assigned, is responsible for collecting,

processing, and preparing historical products based on interviews, documents,

photographs, and artifacts collected by mobilized reserve historians.  Pl. App. 119, 128-

29.

Colonel Hoffman served continuously on active duty from 1981 until 1992, and

his most recent period of active duty in excess of 30 days was from June 2000 until June

2002, during which time he served as the Deputy Director of the History & Museums

Division.  AR 358.  Since at least 1992, Colonel Hoffman has only deployed as a Field

Historian once—a two-week assignment in Iraq from July through August 2003.  AR

357-58.  Colonel Hoffman's last period of active duty was from February 14 to February

25, 2005.  The plaintiff was transferred to the retired reserve list on September 30, 2008.

Am. Compl. ¶ 12.  In total, the plaintiff was credited with more than 28 years of service,

of which more than 17 were on active duty.  Am. Compl. ¶ 3; AR 177, 357-58.

### C.  Colonel Hoffman's Medical History

Beginning in February 1999, the plaintiff started experiencing a variety of

symptoms that he now alleges were caused by amyloidosis.  Pl. Mot. 3-4.  Dr. David

Selden, who is the Director of the Amyloidosis Treatment and Research Program at the

Boston University Medical Center ("BUMC") and one of Colonel Hoffman's doctors,

explains that, ". . . Amyloidosis is a rare disease striking 2500-4000 patients annually in

the continental United States.  It is a deposition disease caused by the production of

abnormal light chains by clonal plasma cells in the bone marrow. . . . [T]he accumulation

of amyloid deposits in the heart, kidneys, liver, GI tract and autonomic nervous system leads to progressive disability, organ failure, and early death." AR 147.

Colonel Hoffman's medical records reflect that in 1999 he reported having significant swelling of his lower legs. AR 38. The cause was not determined but the medical records reflect that swelling of the lower extremities is a common side-effect of the use of ibuprofen. The record also reflects that this condition abated and apparently did not reappear until 2006.[14] Between 2000 and 2002 the plaintiff was also diagnosed as having periodontitis and gingivitis. AR 36-37. Tests conducted in 2007 on a blood sample taken from Colonel Hoffman when he exited active service in 2002 showed that he then had low levels of immunoglobulins, which can be a sign of amyloidosis, but that he also was negative for amyloidosis.[15] AR 44-45. Despite these conditions, Colonel Hoffman passed the Marine's physical fitness test in 2003. AR 263. In the spring of 2004, however, Colonel Hoffman reported reduced ability to exercise and was diagnosed with exercise induced asthma. AR 149. An echocardiogram performed on the plaintiff in 2004 showed that the right atrium and right ventricle of his heart still measured within the upper limits of the normal range, AR 44, though diagnostic testing in late 2005 showed that Colonel Hoffman's right atrium had become mildly enlarged. Id.

---

[14] The record includes medical evaluations conducted in 2003, 2004, and 2005 that indicate, and at times explicitly state, that Colonel Hoffman was not then suffering from peripheral, sacral, and/or ankle edema. AR 312, 364-67, 399.

[15] The plaintiff has provided the Informal and Formal PEBs and this court with evidence to suggest that "it is an accepted medical fact that 30 percent of the time this test provides false negatives for people who actually have the disease." Pl. Reply 6 (citing AR 335, 342).

In June 2005, the plaintiff sought treatment at the Mayo Clinic, where doctors first suspected that he could be suffering from amyloidosis.  AR 397.  By November 2005 the plaintiff reported suffering from rapid heartbeat and numbness in his extremities.  Pl. Mot. 5; AR 273, 445.  The treating physicians at the Mayo Clinic referred Colonel Hoffman to Johns Hopkins Hospital in December 2005, where doctors performed a heart biopsy and concluded that he was suffering from amyloidosis.  AR 401.  Subsequent testing at BUMC confirmed the diagnosis.  AR 404.

The plaintiff was treated with stem cell replacement therapy and high doses of chemotherapy in February 2006.  AR 407.  By June of 2006, the plaintiff's treating physicians in Boston reported that Colonel Hoffman had an excellent response to treatment, and recommended that he begin exercising slowly with careful cardiac monitoring.  AR 408.  The plaintiff's doctors determined that he was in complete remission by April 2007, AR 45, 148, however his doctors acknowledged in June 2009 that Colonel Hoffman remained at higher risk for infection and bleeding (due to transplant recovery), reduced exercise capacity, and irregular heartbeat.  AR 148.  The doctors expected the plaintiff's cardiac function to stabilize and possibly improve over time, despite the possibility of continued cardiac problems for the rest of his life.  AR 148.

### D.  Colonel Hoffman's Processing For Continued Military Service

Colonel Hoffman reported his diagnosis of amyloidosis to the Navy on December 29, 2005, soon after it was definitively diagnosed.  AR 312.  Shortly thereafter a medical

board placed him on six months of limited duty.[16]  Over the next month the plaintiff was

examined by a cardiologist and a hematologist at Bethesda Naval Hospital.  Pl. Mot. 7;

AR 225.  On March 6, 2006, the plaintiff's parent command prepared a non-medical

assessment ("NMA") indicating, inter alia, that the plaintiff was not worldwide

deployable and did not have good potential for continued military service.  AR 234-35

("Although [the plaintiff] is a highly-skilled historian, his condition would seem to rule

out the potential for future service.").  Although a MEB had apparently begun reviewing

Colonel Hoffman's case, a program manager at the Bethesda Naval Medical Center

terminated the plaintiff's MEB processing on March 14, 2006 when the Division realized

that Colonel Hoffman had not received a NOE.  AR 180-81.

In keeping with Navy regulations governing cases where a NOE has not been

issued, Colonel Hoffman's case was placed before the CHBUMED on March 27, 2006,

in accordance with SECNAVINST 1850.4E ¶ 3201(b)(2).[17]  AR 394.  On June 7, 2006,

---

[16] In his application to the BCNR, Colonel Hoffman argued that he should have been continued on limited duty through 2007.  AR 103.  Temporary limited duty is a specified period of limited duty authorized initially at a medical treatment facility by a medical board for cases in which the prognosis is that the member can be restored to full duty within the specified period.  SECNAVINST 1850.4E ¶ 2082.  The court notes, however, that Marine Corps members who are in a Ready Reserve status are not eligible for temporary limited duty under SECNAVINST 1850.4E ¶ 1008(b)(2)(b).

[17] As discussed above, the instruction provides, in pertinent part, "An inactive duty reservist who has not been given a NOE and who has been determined by the CHBUMED to be 'Not Physically Qualified' (NPQ) for active duty or retention will be referred, at the member's request, to the Informal PEB for final determination of physical condition.  If the member is found ['Unfit'] by the Informal PEB and assigned the PEB finding of NPQ, the member has the right to demand a Formal PEB."  SECNAVINST 1850.4E ¶ 3201(b)(2).  An inactive-duty reservist who is found NPQ will be honorably discharged, retired if eligible, or offered non-regular retirement.  See id. ¶ 3703.  Members found NPQ are not eligible for disability retirement.  See id. ¶¶ 3408, 4211(b).

CHBUMED determined that Colonel Hoffman was NPQ for retention due to his amyloidosis.  AR 242.  This decision was subsequently endorsed by the Marine Corps Mobilization Command, which informed Colonel Hoffman of its decision on November 15, 2006.  As required by Navy regulations, the Mobilization Command instructed the plaintiff that he could request a hearing by an Informal PEB.  AR 141.

Upon receipt of the November 15, 2006 decision, the plaintiff formally requested that the Marine Corps Mobilization Command grant him a NOE and find that he had incurred his illness while in the line of duty.  AR 243-47.  As part of this request, the plaintiff submitted evidence including, among other things, a list of relevant medical history, records of his medical sick calls, information about amyloidosis, and reports from medical care received from the Mayo Clinic, Johns Hopkins, and the BUMC.  AR 244.  On December 18, 2006, the Marine Corps Mobilization Command rejected the plaintiff's request for a NOE, AR 248, and instructed him to appeal the CHBUMED finding that he was not physically qualified to the PEB, which would "consider the evidence and make the ["Fit" or "Unfit"] determination and rate if appropriate."  AR 248.[18]

### E.  The Physical Evaluation Board Decisions

An Informal PEB was convened on April 3, 2006, to consider Colonel Hoffman's case, AR 330-31, and on April 18, 2006, the plaintiff was notified that he had been found

---

[18] Colonel Hoffman apparently elected not to appeal the denial of his NOE/LODD to the Office of the Judge Advocate General, as provided for by SECNAVINST 1770.3C ¶ 12 or SECNAVINST 1770.3D ¶ 12.

"Unfit," with a recommended disposition that he was "not physically qualified to continue reserve status." The Informal PEB further found that the disability was not a proximate result of performing military duty, and that the disability may be permanent. AR 252.

After the plaintiff's request for reconsideration was rejected, Colonel Hoffman requested that his case be considered by a Formal PEB. AR 111. On July 12, 2007, the Formal PEB met and determined that Colonel Hoffman should undergo additional testing before a final decision could be made. At the Formal PEB's direction, the plaintiff underwent examinations by an orthopedist on July 30, 2007, a cardiologist on August 9, 2007 (including an echocardiogram), and a treadmill stress test on September 10, 2007. Pl. Mot. 12; AR 227. The plaintiff also testified before the board when the Formal PEB reconvened on February 14, 2008. AR 260. On April 8, 2008, following its review of the evidence gathered over the prior nine-month period and the evidence adduced at the February hearing, the Formal PEB issued its final decision, finding that the plaintiff was "Fit" to continue naval service.[19] Specifically, the Formal PEB concluded as follows:

> The gist of the argument is whether or not the member is impaired by his disease process to the point that he is disabled in the performance of his duties. Dr. Klett, [one of Colonel Hoffman's doctors at BUMC,] indicates that he is in remission and that currently the member experiences only occasional cardiac condition abnormalities due to the amyloid fibrils in the heart. However, he opines that the member is currently not producing amyloid fibrils as a result of his treatment and that yearly follow-up is

---

[19] In finding Colonel Hoffman "Fit," the Formal PEB necessarily determined that there was sufficient evidence to determine that his condition was incurred or aggravated during a period of active duty. Otherwise, the PEB would have found him to be "Physically Qualified." See SECNAVINST 1850.4E ¶ 3201(b)(3)(b).

> required.  Dr. Klett also opines that the member's neuropathic symptoms of
> the hands [numbness] are probably also the result of his amyloidosis but by
> the member's own admission these are not disabling.  Therefore, the
> Formal Board concludes that while the member has a disease process it
> does not preclude him from the performance of his duties.

AR 263.[20]  The Formal PEB therefore concluded that Colonel Hoffman was "Fit" for

continued naval service.  AR 263.

On April 25, 2008, the plaintiff filed a petition for relief from the Formal PEB

determination with the Navy Council of Review Boards ("NCRB"), AR 116-34, alleging

that he was not "Fit" for service and that he was entitled to disability benefits.  Id.  The

plaintiff submitted additional evidence including, among other things, results from a

treadmill tests conducted by the Department of Veterans Affairs ("VA") in March 2008

that indicated lower cardiac function than the PEB had extrapolated from the plaintiff's

testimony.  On May 30, 2008, the NCRB denied the petition.  AR 135-38.  In denying the

petition for relief the NCRB explained that the medical evidence established that Colonel

Hoffman would be able to continue to engage in a level of activity consistent with the

duties of his pay grade.  AR 136.  In addition, the NCRB explained that none of the

plaintiff's claims of mistake of law regarding evidence or process had merit.  The NCRB

noted that although Colonel Hoffman "may not be world-wide deployable, able to

complete the [Physical Fitness Test], or perform certain tasks. . . the evidence strongly

---

[20] In addition to seeking a finding that he was "Unfit" and entitled to a disability retirement based
on his illness, Colonel Hoffman also sought a disability rating based on shoulder and back
problems he was experiencing.  AR 260.  He asked for a total combined disability rating of 50
percent and placement on the TDRL.  AR 260.

indicates that [he] can continue to perform duties similar to those [he had] done in the past, which are appropriate for [his] pay grade."  AR 137.

On May 9, 2008, the Marine Corps informed Colonel Hoffman that he would be screened for mobilization potential, AR 173-74.  The May 9, 2008 order stated that "if eligible, you may request transfer to the retired Reserve in order to receive non-Regular retired pay at age 60."  AR 174.  Thereafter, on September 30, 2008, the plaintiff was transferred to the retired reserve awaiting pay at age 60.  AR 176-77.  Earlier, on August 1, 2008, the VA had granted the plaintiff's request that he be rated as 30 percent disabled based on his amyloidosis.  The VA had also agreed with the plaintiff's contention that the amyloidosis was service connected.[21]  AR 71.

### F.  The Board of Corrections for Naval Records

On July 7, 2009, the plaintiff, acting pro se, applied to the Board of Corrections for Naval Records ("BCNR") seeking relief from the decision of the Formal PEB and NCRB.  Pl. Mot. 15; AR 87-105.  The application contained additional evidence, including letters from Colonel Hoffman's treating physicians as well as medical test results from 2005 through 2009.  The plaintiff alleged a variety of errors, including: (1) the Navy's failure to find that his amyloidosis was incurred during a period of active service; (2) its delay in granting the plaintiff access to the DES and PEB review; (3) its failing to place him on either the TDRL or on Temporary Limited Duty; and (4) its decision to find him "Fit" for duty.  Id.  Colonel Hoffman's principal argument before the

---

[21] Colonel Hoffman received an additional 30 percent disability for his shoulder and back issues.  AR 73.  He was to begin receiving monthly payments of $728 as of August 2008.  Id.

BCNR was that, had he been properly processed into the DES when he first reported his illness in 2006, and before he received his stem cell transplant, the Navy would have deemed him "Unfit" and eligible for benefits under the regulations governing the TDRL. Id.

The BCNR subsequently obtained an advisory opinion from the Director of the Secretary of the Navy, Council of Review Boards, who, on December 23, 2009, determined that Colonel Hoffman's new evidence, including testimony of an otherwise undocumented decrement in cognitive ability, was "insufficient to warrant . . . the requested change." AR 60.  In his recommendation, the Director wrote that, "[t]he . . . evidence strongly suggests that neither Colonel Hoffman's cardiac nor shoulder and back conditions were individually[,] or in combination by overall effect, sufficiently impairing of duty performance to render him ["Unfit"] for Continued Naval Service as a Marine Corps Historian, at the pay grade of an 0-6." AR 61.  The Director further noted that the results of the March 2008 treadmill stress test, which reflected exertion limitation of 6-7 Metabolic Equivalent Tasks ("MET"), "remained compatible with the exertion required to be able to perform appropriate duties for his pay grade at that time." AR 61.  The Director's recommendation was also based on testimony by Colonel Hoffman at his Formal PEB that indicated that he had, "the residual ability to walk 'for 30 minutes on flat ground daily, is able to transit two flights of stairs, does not suffer from paroxysmal nocturnal dyspnea or use additional pillows at night[,] stands for 20 minutes . . . drives for one hour with the use of lumbar support and uses a modified straight back chair at

work.'" AR 60-61.  The plaintiff was given the opportunity to respond to the NCRB

recommendation.  AR 63-64.

On December 21, 2010, the BCNR informed the plaintiff that after considering all

of the information provided, his application had been denied.  AR 57.  The BCNR stated

that the evidence was not sufficient to overturn the Formal PEB's conclusion that Colonel

Hoffman was "Fit" for duty.  AR 57.  The BCNR also explained that they did not believe

that Colonel Hoffman should have been ordered to active duty to undergo treatment or

consideration of his case by the PEB.  AR 57-58.  They further rejected Colonel

Hoffman's claim that the extended period of evaluation resulted in any injustice.

"[Colonel Hoffman has] not established that [he was] entitled to immediate referral to the

PEB upon [his] report of the diagnosis of amyloidosis, or that officials of Headquarters,

U.S. Marine Corps, the Bureau of Medicine and Surgery or the disability evaluation

system failed to substantially comply with applicable order and instructions."  AR 57-58.

In other words, they rejected Colonel Hoffman's claim that, had he been timely evaluated

before treatment, the outcome would have been different.  Although the Formal PEB had

apparently found Colonel Hoffman's amyloidosis to have been service-connected,[22] the

BCNR responded to the plaintiff's allegations of error by the Informal PEB by stating

that it "was not persuaded that [Colonel Hoffman's] condition of amyloidosis was

---

[22] As noted, SECNAVINST 1850.4E ¶ 3201(b)(3)(b) prohibits a PEB from rendering a finding
of "Fit" unless there is sufficient evidence to establish that the service member's condition was
incurred or aggravated in the line of duty.  Because the Formal PEB found Colonel Hoffman
"Fit," the court concludes that the Formal PEB must have also found sufficient evidence, or at a
minimum assumed, that his amyloidosis was service-incurred or aggravated.

incurred or aggravated while [he was] entitled to basic pay or that [he was "Unfit"] for duty by reason of physical disability that was incurred in or aggravated by [his] service." AR 57.

Colonel Hoffman sought reconsideration of the BCNR decision on February 22, 2011, which was denied on July 11, 2011. See AR 190. Thereafter, Colonel Hoffman appealed directly to the Secretary of the Navy for reconsideration. On September 7, 2011, the Secretary of the Navy rejected the request. AR 190. Colonel Hoffman responded to the Secretary's denial in a letter dated September 11, 2011 stating that he had proven, "beyond any legitimate doubt that [he] had [amyloidosis] while [he] was on extended active duty, and that [he] was so seriously ill in 2006 that [he] could not possibly have been ['Fit.']" AR 188-89.[23]

The plaintiff filed this suit in the United States Court of Federal Claims on January 19, 2012. Am. Compl. at 1. Colonel Hoffman's principal claim before this court is that he should have been processed into the DES immediately upon reporting his illness, found "Unfit," and placed on the TDRL during his treatment.[24] He therefore claims that the BCNR decision finding that his illness was not incurred during a period of active duty and that he is "Fit" were both procedurally and substantively flawed and should be set

_____

[23] The documents submitted by Colonel Hoffman to the BCNR for reconsideration, including one from Dr. Seldin, Director, Amyloid Treatment and Research Program at BUMC, were submitted as supplements to the Administrative Record. AR Supp. 2. In his letter, Dr. Seldin states that in his best judgment, "Colonel Hoffman's cardiovascular symptoms that were noted in 2003 and eventually led to the definitive diagnosis of . . . amyloidosis in 2005 were due to a disease process that most certainly began in the bone marrow in 2002 or earlier." Id.

[24] The plaintiff properly invokes the court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2006) and 10 U.S.C. § 1201. See Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005).

aside.  The government argues in response that the fitness determination is supported by

substantial evidence and that Colonel Hoffman's objections to how he was processed

through the DES are not supported and, in any event, do not justify setting aside the

BCNR's decision.  Briefing was completed on October 3, 2012 and the court held oral

argument on December 7, 2012.

## II.   DISCUSSION

### A.  Standard of Review

The United States Court of Federal Claims reviews decisions of the BCNR to

determine whether the decisions were arbitrary, capricious, contrary to law, or

unsupported by substantial evidence.  Lewis v. United States, 476 F. App'x 240, 242

(Fed. Cir. 2012) (reviewing judgment on Administrative Record from the BCNR); Roth

v. United States, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (reviewing judgment on

administrative record from the Air Force Board for the Correction of Military Records).

Under this standard, the court determines whether the BCNR considered all of the

competent evidence and whether or not the challenged conclusion is supported by that

evidence.  Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983).  This inquiry is

not, however, an exercise in reweighing the evidence that was before the BCNR, and this

court will not disturb the decision of the agency when that decision is reasonable in light

of the evidence presented.  See id.

**B.  The Navy's Determination that Colonel Hoffman was "Fit" for Continued Naval Service Was Not Arbitrary or Capricious and was Supported by Substantial Evidence**

First and foremost, the plaintiff takes issue with the BCNR's decision that he was "Fit" for continued naval service.  Pl. Mot. 39.  Colonel Hoffman argues that the BCNR should have set aside the Formal PEB's finding of "Fit" because the Formal PEB did not comply with SECNAVINST 1850.4E, ¶ 3306(a), which provides that the PEB, in determining fitness, must weigh all relevant evidence "in relation to all known facts and circumstances which prompted referral for disability evaluation."  Pl. Mot. 40.  In particular, Colonel Hoffman argues that the Formal PEB (1) failed to examine the specified duties and requirements of a Field Historian (including the ability to deploy), Pl Mot. 41; (2) failed to give sufficient weight to the November 15, 2006 determination by the CHBUMED that Colonel Hoffman was not physically qualified for retention due to amyloisosis, Pl. Mot. 42; (3) failed to provide sufficient weight to the Informal PEB finding that Colonel Hoffman was not physically qualified to continue in reserve status, Pl. Mot. 42; (4) failed to give sufficient weight to the Marine Corps Mobilization Screening Command recommendation that Colonel Hoffman lacked mobilization potential as of June 16, 2008, Pl. Mot. 43; (5) improperly extrapolated the plaintiff's MET score from Colonel Hoffman's extemporaneous testimony during the Formal PEB—as demonstrated by a subsequent treadmill test conducted by the VA that reflected a MET rate of 6-7; and (6) improperly rendered a decision on the plaintiff's case without a current NMA of his duty performance and potential for continued service, Pl. Mot. 44.

It is well established that this court does not sit as a "super correction board," Skinner v. United States, 594 F.2d 824, 829-30 (Fed. Cir. 1979).  The Federal Circuit has made clear that, "[i]n general . . . the questions of the fitness of an officer to serve on active duty, and in what capacity the officer should serve, are not for the courts to decide."  Lewis v. United States, 458 F.3d 1372, 1377 (Fed. Cir. 2006) (citing Fisher, 402 F.3d at 1180-81).  In this case, the administrative record includes substantial evidence supporting the BCNR's decision that there was no probable material error or injustice when the Formal PEB determined that the plaintiff was "Fit" for service performing the non-deployed aspects of duty as a Field Historian.

As to the plaintiff's first contention, there is sufficient evidence in the record to support the Formal PEB's conclusion that Colonel Hoffman was able to perform the tasks of a Field Historian, which are administrative in nature.  Contrary to the plaintiff's contention that a Field Historian needs to be deployed to fulfill his duties, the record demonstrates that the plaintiff had been deployed only once since 1992: a two-week assignment in Iraq from July through August 2003.  AR 357-58.[25]

---

[25] Colonel Hoffman stressed before both the BCNR and this court that the Formal PEB's finding must be erroneous because "[t]he 'Field Historian'. . . is deployment based.  The USMC History Division does not have purely administrative duties for reserve officers. . .There are no reserve historian billets outside the Field History Branch and there are no active duty historian billets for colonels."  Pl. Mot. 3.  This may be true, but the court is not aware of—and counsel for the plaintiff does not cite to—any statute, regulation, or prior precedent indicating, in the context of disability retirement processing, that the Navy must affirm the existence of an open billet prior to finding a member "Fit" for duty.  The plaintiff's argument must be rejected, as it invites the sort of judicial interference in military personnel affairs proscribed by the Federal Circuit.  Fisher, 402 F.3d at 1180 ("[W]ho should be allowed to serve on active duty, and in what capacity . . . . is for the Executive to decide.").

In addition, the advisory opinion to the BCNR from the NCRB found that the plaintiff had recovered to a sufficient degree that he was capable of fulfilling administrative duties appropriate for his office, grade, rank or rating, despite certain limitations on physical activities described at the time of the contested Formal PEB determination and Colonel Hoffman's long-term prognosis.  AR 60.  The evidence established that by June of 2006—roughly six months after receiving a stem-cell transplant and chemotherapy—the plaintiff's treating physicians in Boston reported excellent response to therapy, and recommended that the plaintiff begin exercising slowly.  AR 408.  In April 2007, the plaintiff's doctors determined that he was in complete remission.  AR 148.  Although the plaintiff's doctors cautioned, in June 2009, that he remained at higher risk for infection and bleeding, reduced exercise capacity, and irregular heartbeat, those same doctors also stated that they expected the plaintiff's cardiac function to stabilize and possibly improve over time.  AR 147-48.  Indeed, Colonel Hoffman had been working as a civilian historian for the Department of the Army during much of the period in question.  AR 113.

Further, the plaintiff's contention that the BCNR did not give sufficient weight to the decisions of the CHBUMED, the Formal PEB, or the Marine Corps Mobilization Screening Command is not an appropriate basis for relief.  The plaintiff's reliance on these earlier evaluations ignores the improvements to his health.  The substantial evidence standard is satisfied with such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Gossage v. United States, 394 F. App'x 695, 697 (Fed. Cir. 2010) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197,

229 (1938)); <u>Verbeck v. United States</u>, 89 Fed. Cl. 47, 63 (2009).  Viewing the record as a whole, the court finds that there is sufficient evidence to demonstrate that despite Colonel Hoffman's initial illness, he has regained much of his health after treatment.  The BCNR's decision was not arbitrary or capricious regarding the plaintiff's fitness.  Indeed, the BCNR addressed the plaintiff's major objections to the fitness determination, including Colonel Hoffman's objection to findings regarding his current health status.  Colonel Hoffman contended, for example, that the Formal PEB erroneously extrapolated his MET rate of "10" based on Colonel Hoffman's testimony before the Formal PEB.  Pl. Mot. 43.  However, the NCRB's recommendation to the BCNR specifically addressed this error when it found that even the 6-7 MET rating provided by the VA's March 2008 treadmill test was "compatible with the exertion required to be able to perform appropriate duties for [Colonel Hoffman's] pay grade [in 2008]."  AR 61.  Thus, the BCNR correctly appreciated the limitations on Colonel Hoffman's fitness but concluded, given the nature of his duties, that these limitations were not sufficient to render him "Unfit."

Put simply, the evidence in the record demonstrates that Colonel Hoffman's illness was fully considered and the court finds that his disagreements with the BCNR's conclusions are not enough to overturn the BCNR's fitness determination.

### C.  The Navy's Decision to Process Colonel Hoffman Through the DES Without a MEB Was Not Arbitrary, Capricious, Unsupported by Substantial Evidence, or Contrary to Law

Colonel Hoffman argues that the fitness decision should be set aside because he was not properly processed into the DES.  As noted, Colonel Hoffman contends that had

the Navy properly processed him, he would have received a MEB, which would have

allowed him to rebut evidence that his amyloidosis was not service-incurred prior to the

decision of the Informal PEB.  Pl. Mot. 33, 36.  Had the plaintiff had this opportunity, he

continues, the Informal PEB would have presumably found his amyloidosis to have been

service-connected and would have granted Colonel Hoffman disability benefits in 2007.

In such circumstances, Colonel Hoffman concludes, he would never have appealed the

Informal PEB fitness determination and, as a result, the Formal PEB never would have

found him "Fit."  Rather, he assumes that the Informal PEB would have placed him on

the TDRL while he was being treated and paid him disability benefits.  Colonel Hoffman

painstakingly unpacks each of these points in his briefs and asks this court to find that the

processing errors were sufficiently egregious to warrant a reversal.

Colonel Hoffman begins by objecting to the Navy's failure to grant him a medical

evaluation through a MEB.  As discussed above, inactive duty reservists are only entitled

to a MEB if they are referred to the DES for a duty-related impairment.[26]  Otherwise,

---

[26] Although some confusion exists in this case as to how Colonel Hoffman was referred to the DES, the record reflects that the Navy intended to process Colonel Hoffman under provisions that applied to a reservist whose condition was not duty-related.  Contrary to Colonel Hoffman's contention, the January 3, 2006 Abbreviated Limited Duty Medical Board report does not unambiguously indicate whether the observing physician had concluded that the illness was duty-related.  AR 236.  By contrast, the Navy's conclusion that the illness was not duty-related is clearly indicated by the decision, in March 2006, to terminate Colonel Hoffman's MEB processing.  AR 180-81.  Perhaps most importantly, the CHBUMED's June 7, 2006 letter found that Colonel Hoffman was NPQ, AR 242, which is the appropriate label for non duty-related conditions under SECNAVINST 1850.4E ¶ 3201(b)(2).  Nor is it of any moment that the Formal PEB ultimately found, or at least assumed, that Colonel Hoffman incurred his illness during active service.  SECNAVINST 1850.4E ¶ 3201(b)(3)(b) is specifically designed to address the scenario of an inactive duty reservist seeking benefits for a condition that was initially found not to be duty-related.

either a physical examination or a MEB is sufficient.  See DoDI 1332.38 ¶ E3.P1.2.2.

The plaintiff argues that the Informal PEB's and the BCNR's decisions that the plaintiff's

illness was not duty-related were not supported by substantial evidence.  Pl. Mot. 20

(citing Doe v. United States, 132 F.3d 1430, 1434 (Fed. Cir. 1997)).  In the alternative,

the plaintiff argues that he was entitled to a MEB as a matter of law in light of the

presumptions described in DoDI 1332.38 ¶ E3.P4.4.4 and SECNAVINST 1850.4E ¶

3410.  Pl. Mot. 30.  The court takes up these arguments in order.

The plaintiff argues that his medical record demonstrates that he incurred his

amyloidosis while on active duty between 2000 and 2002, and thus he was entitled to a

MEB and timelier referral to the Informal PEB.  In support of this proposition, he points

to the gingivitis and swelling of the legs, which his doctors have stated are sometimes

early symptoms of amyloidosis and which would be best explained as early symptoms of

amyloidosis in his case.  AR 37-38, 44-45.  The plaintiff also points to the test of his

2002 blood sample, which showed low levels of immunoglobulins.  This result,

according to the plaintiff's treating physician, "is very often seen in primary (AL)

amyloidosis," and could not be explained by any other condition.  AR 44-45.  Finally, the

plaintiff relies on the letter from his treating physician at the BUMC's Amyloid Research

Laboratory which concluded that, "[t]hough Colonel Hoffman's military duty did not

cause his AL amyloidosis, given his history of symptoms [and] no other significant past

medical history which could explain these symptoms . . . it is most likely that Colonel

Hoffman's amyloidosis began prior to 2002."  AR 44-45.

The government argues in response that the Navy's decision not to process Colonel Hoffman into the DES through a MEB is supported by substantial evidence in the record and should not be disturbed.  The government argues that while his doctors assert that the beginnings of his illness may date back to 2002, no recognizable medical authorities or scientific or medical journals are reflected in the record to establish that the various symptoms Colonel Hoffman exhibited in 1999 through 2002 were due to the amyloidosis ultimately diagnosed in 2005.  Def. Reply 25.  Moreover, the record demonstrates that these symptoms can be explained without reference to amyloidosis. The BCNR noted that there was evidence in the record to show that "swelling of the lower extremities is a common side-effect of the use of [ibuprofen]" and that "gingivitis is common among the middle aged . . . includ[ing] those who follow good oral hygiene practices."  AR 58.  As noted above, the medical record also indicated that the swelling apparently resolved itself and did not appear again until 2006.  The defendant also notes that, although the plaintiff presented low immunoglobulin levels in 2002, Colonel Hoffman also tested negative for amyloidosis in a diagnostic specifically used to identify the disease.  AR 44-45.  Colonel Hoffman was able to pass his military physical fitness test in 2003, AR 263, and the record further demonstrated that the plaintiff's 2004 echocardiogram showed that Colonel Hoffman's right atrium and right ventricle still measured within the limits of normal size.  AR 44.

The court finds on this record that substantial evidence supports the BCNR's conclusion that the plaintiff was not suffering from amyloidosis during his period of

active service from 2000 through 2002.  Therefore, the Navy did not err when it

processed him into the DES through the CHBUMED, rather than through a MEB.[27]

The court also rejects Colonel Hoffman's argument that he should benefit from the

presumption that a disease was incurred in the line of duty, and that he therefore was

entitled to a MEB as a matter of law.  Although active duty members are entitled to the

presumption that a non-hereditary or non-congenital disease was incurred in the line of

duty, this presumption is not available to inactive duty reservists.[28]  Therefore, the court

---

[27] The court further rejects the plaintiff's argument to the extent that he argues he was prejudiced
by the absence of a more recent NMA as part of the record before the PEB or BCNR.  The
NMA, which is almost always required as part of a MEB report, is described as "crucial in
summarizing the member's limitations from the perspective of the commanding officer."
SECNAVINST 1850.4E ¶ 1001(k).  The record before the BCNR included a NMA for Colonel
Hoffman dated March 17, 2006, in which Colonel Hoffman's commanding officer indicated that
he did not have good potential for continued service.  Given the improvement in Colonel
Hoffman's condition in the two years following his transplant, a more current NMA would
almost certainly have been more supportive of a finding of "Fit."  Therefore, the court finds that
the absence of a more recent NMA from the record, if erroneous, was harmless.

[28] The parties dispute whether the presumption that a disease was incurred in the line of duty is
available to a presently inactive duty reservist who alleges that his disease was incurred during a
prior period of active duty.  The government correctly observes that DoDI 1332.38 ¶ E3.P4.5
("Evidentiary Standards for Determining Compensability of ['Unfitting'] Conditions") expressly
limits the availability of the presumption of service-incurrence.  Def. Mot. 21.  The court must
acknowledge, however, that no such explicit limitation can be found in DoDI 1332.38 ¶
E3.P4.4.4 (Presumptive Determinations) or SECNAVINST 1850.4E ¶ 3410 (Line of Duty).

Nevertheless, the court is persuaded that the presumption is not available to a reservist who
enters DES under SECNAVINST 1850.4E ¶ 3201(b)(3).  First, there would be little reason for
the Navy to require, as ¶ 3201(b)(3) does, an inactive reservist to furnish documentary evidence
of service-incurrence if the Navy also intended to afford the reservist the benefit of the
presumption.  Second, if the presumption applied then there would be no reason to prohibit the
PEB from making a "Fit" or "Unfit" determination absent documentary evidence of service-
incurrence, because an unrebutted presumption would suffice.  Third, DoDI 1332.38 ¶
E3.P4.4.5.6 requires that a line of duty determination be conducted for reservists with an "illness
of a Ready Reserve member while performing duty of 30 days," which suggests that the
presumption should not apply to inactive duty members simply because they allege initial

rejects the plaintiff's argument that he was entitled to a MEB by virtue of DoDI 1332.38 or SECNAVINST 1850.4E.  Moreover, regardless of whether Colonel Hoffman's illness was properly characterized as service-incurred or not, the BCNR's ultimate finding of "Fit" renders harmless any error in failing to process Colonel Hoffman's MEB.  There is no evidence in the record to suggest that the Formal PEB or the BCNR did not have a thorough and complete understanding of Colonel Hoffman's health status on which to find him "Fit" for continued service.  Indeed, all of the evidence the plaintiff relies upon to now challenge the fitness and incurrence determinations by the PEBs was before the BCNR.  Accordingly, the court rejects Colonel Hoffman's claims regarding the denial of a MEB.

### D.  Colonel Hoffman Was not Prejudiced by Alleged Delays in DES Processing

Finally, the plaintiff argues that, even if Colonel Hoffman was "Fit" as of April 2008 (the date of the Formal PEB decision), the Navy erred by failing to make an earlier disability determination.  He argues that, had he been timely evaluated for fitness by the Formal PEB while he was still recovering from his stem cell transplant, he would have

---

incurrence during active duty.

Instead, this court concludes that ¶ 3201(b)(3) simply grants an inactive duty service member "one last bite at the apple" to demonstrate to the PEB that, notwithstanding the absence of a NOE/LODD, he or she is "Unfit" due to a disability incurred during a period of active service.  Such a reading also comports with ¶ 3408 (inactive-duty reservist normally not eligible to receive disability retirement).  Therefore, the court concludes that inactive duty reservists who enter the DES under ¶ 3201(b)(3) are not entitled to the benefit of the presumption of service-incurrence.

been found "Unfit" for duty.  He argues he has been prejudiced by the PEB's decision to

suspend consideration of his case until he recovered.

The court is not aware of any authority that would suggest that the Navy erred in

failing to expedite consideration of Colonel Hoffman's fitness determination.[29]  Although

SECNAVINST 1850.4E ¶¶ 3203, 3204, states that a case will not be suspended in excess

of 60 days when the PEB requires additional information to determine fitness,

SECNAVINST 1850.4E ¶ 1009(a) expressly contemplates, in connection with the DES,

that time frames can be exceeded in unusual circumstances.  The court finds that the

present situation, in which (1) an inactive duty reservist requested a PEB after receiving

stem cell treatment for a rare, progressive, and systemic disease; (2) the Formal PEB

determined that additional medical evidence was necessary to make a fitness

determination; and (3) the Formal PEB encountered difficulties, including scheduling

problems, acquiring such evidence,[30] constitutes a sufficiently unusual circumstance so

---

[29] At oral argument the plaintiff argued that he may have been entitled to incapacitation pay under SECNAVINST 1770.3 during the time period he was undergoing medical evaluation. This may have been true, but that issue is not presently before the court.  At the outset, the court notes that that Colonel Hoffman apparently never appealed the June 7, 2006 denial of his NOE to the Office of the Judge Advocate General.  More importantly, even given a liberal construction, see Erickson v. Pardus, 551 U.S. 89, 94 (2007), Colonel Hoffman's pro se applications to the BCNR in 2009 and 2011 did not claim that the Navy improperly withheld incapacitation benefits as conceivably were due under 37 U.S.C. § 204 and SECNAVINST 1770.3.  As a result, the plaintiff has waived the right to seek this court's review of that issue.  See Metz v. United States, 466 F.3d 991, 999 (Fed. Cir. 2006); Barnick v. United States, 80 Fed. Cl. 545, 560 (2008).

[30] The Secretary of the Navy Council of Review Boards also addressed the duration of the suspension of Colonel Hoffman's Formal PEB, noting that "the formal hearing was suspended in order to gather additional and current medical evidence.  The resulting delay . . . is regretted but was due to difficulties in obtaining the requested information.  Scheduling conflicts also contributed to the delay."  AR 137.

as to justify exceeding the time standards.  <u>Cf.</u> SECNAVINST 1850.4E ¶ 3206(b)

(suspension appropriate for non-elective surgery).[31]  Therefore, the court will not set

aside the BCNR's fitness determination on the ground that the decision was based on

medical evidence provided by Colonel Hoffman and the Navy after his amyloidosis went

into remission.

## III.  CONCLUSION

For the foregoing reasons, the government's motion for judgment upon the

administrative record is **GRANTED**, and the plaintiff's cross-motion for judgment on the

administrative record is **DENIED**. The Clerk shall enter judgment accordingly, and each

party shall bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[31] This provision states that, "[w]hen hospitalization or non-elective, urgent surgery occurs or is contemplated for a service member who has a case before the PEB, the [Medical Treatment Facility] shall notify the PEB . . . requesting [that the] PEB suspend or terminate the case.  The statement will include the rationale for the requested action including the urgent nature of the hospitalization or surgery."  <u>See also</u> SECNAVINST 1850.4E ¶ 3206(b)(2) ("The timeliness and completeness of submission of any new medical information after a case has been referred to the PEB is critical to ensure PEB determinations are based on up-to-date, complete and accurate information.").